

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-18-00080-CV

IN THE INTEREST OF G.H. AND
G.H., CHILDREN

----------

FROM THE 323RD DISTRICT COURT OF TARRANT COUNTY
TRIAL COURT NO. 323-103932-16

----------

## MEMORANDUM OPINION[1]

----------

### I. INTRODUCTION

This is an ultra-accelerated appeal[2] in which G.H. (Father) and K.B.

(Mother) appeal the termination of their parental rights to their children, Gail and

---

[1]*See* Tex. R. App. P. 47.4.

[2]*See* Tex. R. Jud. Admin. 6.2(a) (requiring appellate court to dispose of appeal from a judgment terminating parental rights, so far as reasonably possible, within 180 days after notice of appeal is filed).

Grant,[3] following a bench trial.  In three issues, Father challenges the sufficiency of the evidence to support the trial court's findings under section 161.001(b)(1)(D), (E), and (2) and argues that the trial court improperly took judicial notice of the permanency-hearing orders.  *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E), (2) (West Supp. 2017).  In nine issues, Mother challenges the sufficiency of the evidence to support the trial court's findings under section 161.001(b)(1)(D), (E), (O), and (2) and the trial court's decisions to deny various motions, to admit testimony about a prior termination, and to take judicial notice of allegedly unadjudicated facts.  *See id.* § 161.001(b)(1)(D), (E), (O), (2).  Because we hold that sufficient evidence supports the unchallenged subsection (M) findings and the best-interest findings as to both parents, we will affirm the trial court's judgment terminating Father's and Mother's parental rights to Gail and to Grant.

## II. FACTUAL BACKGROUND[4]

### A. Overview

Father and Mother are not married and do not live together, but they have "been together" for more than eleven years and have had four children together. Father's and Mother's parental rights to their first two children—twins Ginny and

---

[3]*See* Tex. R. App. P. 9.8(b)(2) (requiring court to use aliases to refer to minors in an appeal from a judgment terminating parental rights).  Aliases are used for all children referenced in this opinion.

[4]Because both Father and Mother challenge the sufficiency of the evidence to support the termination order, we set forth a detailed factual background.

2

Gavin—were terminated in 2014 based on family code section 161.001(b)(1)(D) and (E)—endangering environment and endangering conduct based on Father's and Mother's drug use.[5]  Gail was born in September 2015.  When Grant was born in July 2016, the Department received a referral alleging neglectful supervision because Grant had tested positive for cocaine at birth.  After Mother violated the safety plan set up by Family Based Safety Services (FBSS), the Department removed Gail and Grant and gave Father and Mother service plans.  Father and Mother did not make the changes the Department requested of them, which resulted in the termination of their parental rights to Gail and to Grant.

## B.  Gail's Birth and Mother's Care of Gail

Mother testified that she had learned her lesson when her parental rights to her twins were terminated.  So when she became pregnant with Gail, she "got [her] life together."  Mother worked throughout her pregnancy with Gail.  Both Mother and Gail tested negative for drugs when Gail was born in September 2015.  Mother stayed home with Gail for the first year after she was born.  During that time, Mother's aunt supported her financially, and her sister gave her rides to doctor appointments.  When Mother returned to work, her sister cared for Gail.

---

[5]The order terminating Father's and Mother's parental rights to Ginny and to Gavin was admitted during the underlying termination trial.

3

## C. Grant's Birth, CPS's Initial Contact with Gail and Grant, and Case Opened with FBSS

Grant was born in July 2016 at thirty-four weeks' gestation. CPS received a referral alleging neglectful supervision of Grant because he had tested positive for cocaine at birth and because Mother's midwife had reported that Mother had tested positive for cocaine during her pregnancy with Grant at her February 2016 and March 2016 appointments. Mother admitted to CPS investigator Valerie Robertson that she had used cocaine in September 2014 when her parental rights to the twins were terminated, but Mother denied cocaine use while she was pregnant with Grant. Robertson spoke with Mother's midwife, who said that Mother had disclosed at her March 2016 appointment that she was taking antianxiety medication. Mother told Robertson that the medication was not antianxiety medication but was instead hydrocodone that she had taken from her uncle. Robertson was concerned. She asked Mother to take a hair-follicle drug test, and she opened a case with FBSS requiring Mother to live at her sister's house with Gail and Grant and prohibiting Mother's unsupervised contact with Gail and Grant.

When Robertson asked Mother about the children's father, Mother explained that Father was Gail and Grant's father but said that he did not have any contact with them and was not their caregiver. Mother said that a previous CPS worker had told her to not allow Father to have contact with the children. When Robertson asked if that restriction was due to Father's drug use, Mother

4

would not confirm that Father used drugs.  Mother said that she did not have any contact information for Father.

On August 1, 2016, Robertson and Mother's FBSS caseworker met with Mother to talk about the results of her July 2016 hair-follicle drug test.  It was positive for cocaine.  At this point, Mother admitted that, contrary to her denial of drug use while pregnant with Grant, she had, in fact, "slipped up" and had used cocaine in December 2015.

Robertson expressed concern that Mother had used cocaine after Gail's birth because drug use impairs a parent's ability to properly care for her children. Robertson disposed of the allegations against Mother as reason to believe for neglectful supervision of Grant due to the positive drug test results during pregnancy and as reason to believe for neglectful supervision of Gail because Mother was her primary caretaker.

### D.  Violation of the FBSS Safety Plan Results in a CPS Case

About two months later, on October 19, 2016, the Department received a referral alleging neglectful supervision of Gail by Mother.  Mother had been in a car accident and had left Gail with an acquaintance, who ultimately took Gail to the police station.

CPS Investigator Britni Wortham spoke with Mother while Mother was in an ambulance being checked out by paramedics for a possible head injury following the accident.  When Wortham told Mother that she was aware of the open FBSS case that required Mother not to have unsupervised contact with her

5

children, Mother said that she was not unsupervised because her sister was following behind her in a car prior to the accident.[6]   Mother then took off the diagnostic medical equipment that was attached to her, said that she no longer needed medical attention, and exited the ambulance.  While Wortham was on the phone with her supervisor, Mother walked away.   Mother's sister, who was present, went to find Mother.

When Mother's sister returned with Mother, Mother explained to Wortham that after the accident, she had left Gail with a woman she knew "from the club"[7] while she (Mother) received medical attention in the ambulance.   Wortham expressed concern that Mother had left Gail with a stranger, and Mother said, "I know I messed up."   The unnamed woman left with Gail without telling Mother where she was going, and Mother called the police to report Gail missing. Wortham told Mother that Gail and Grant needed to be placed outside the home because Mother had violated the FBSS safety plan by leaving Gail with a stranger and because Mother's sister had violated the FBSS safety plan by failing to supervise Mother's contact with Gail.   Mother provided the names of several individuals—including Father, for whom she had said she did not have a phone number or address—to serve as possible placements for the children.

---

[6]Mother explained that her sister had a doctor appointment and could not fit both children in her car, so her sister had asked her brother to follow her. Mother and Gail rode with Mother's brother, and Grant rode with Mother's sister. Mother said that her brother lost control of the car and hit a wall.

[7]Mother did not know the woman's name.

6

CPS did not deem any of the named individuals to be adequate placement options for the children, so Wortham decided to place the children in foster care.

Wortham went to the police station and spoke with the woman who had brought Gail to the police station. The woman told Wortham that she did not know Mother's name but knew her from "the club scene." The woman said that she was having lunch at Golden Chick when Mother ran in, said that she was not supposed to have her children, and asked her to watch Gail while she went to the ambulance to be checked out. The woman took Gail home and cleaned her up and then took her to the police station where she learned that Gail had been reported missing.

Wortham found Father's phone number in a computer database and contacted him the following day. Father told Wortham that Mother had called and had informed him that Gail and Grant were in foster care. Wortham invited Father to come to the courthouse that afternoon for a hearing on the Department's removal petition. Father responded that he would not attend the hearing because after CPS performed a background check on him, drug tested him, and instructed him to attend classes, he would not get custody of Gail and Grant.

Following the hearing on the State's petition, the trial court granted the Department temporary managing conservatorship of Gail and Grant. The Department thereafter created service plans for Father and Mother.

7

## E. Father's Services and His Compliance

Father's initial service plan required him to notify his caseworker within forty-eight hours of any involvement with law enforcement; to attend all scheduled visitations with his children; to maintain steady and legal employment; to maintain safe, stable, and appropriate housing; to submit to a drug assessment and to follow through with all recommendations; to maintain contact with his caseworker; to actively engage in and complete STEP parenting classes; and to submit to random drug and alcohol tests within twenty-four hours of his caseworker's request. On December 7, 2017, the trial court added a requirement to Father's service plan requiring him to attend the FOCUS for Fathers class.

Initially, Father did not want to work his services or to be involved in the case. Father ultimately began working his services around July 2017.

Crystal Lewinson, who served as the children's conservatorship worker, received the case in November 2017 and had a conversation with Father via text message on December 19, 2017, in which she asked about his progress on his service plan. Father informed Lewinson that he had completed a drug assessment but not the recommendations made as a result of the drug assessment, which included attending drug-therapy classes. Father said that he had attended a few of the drug classes but had stopped when he was arrested for possession of a controlled substance and unlawful possession of a firearm on September 24, 2017, and had not resumed attendance after his release from jail in October 2017. Father claimed that he was not attending drug therapy because

8

he did not have transportation; but when Lewinson offered Father bus passes, Father said he would not ride the bus. Father refused to provide Lewinson with his "sober date"—the date he last used illegal drugs—and told Lewinson that although Gail and Grant were important, he was focused on maintaining his freedom because he would not be able to help his children from jail.

According to Lewinson, Father had attended the majority of the visits with his children, and his interactions with them were positive. Father's housing situation was unknown at the time of the termination trial. Although Father told Lewinson he had his own apartment, he refused to provide an address or details. With regard to Father's service plan, Lewinson testified that Father had completed STEP parenting classes and a drug assessment, had attended parent-child visits, and had kept in contact with her. Father had not participated in group outpatient drug treatment three times per week as recommended by the drug assessment; had not taken two requested drug tests; had tested positive for cocaine on his June 1, 2017 urinalysis and his August 4, 2017 urinalysis; and had not completed the FOCUS for Fathers class. Lewinson concluded that Father had not been fully compliant with the services requested of him to demonstrate change.

### F. Mother's Services and Her Compliance

Mother's service plan required her to maintain contact with her caseworker; to notify her caseworker within forty-eight hours of any involvement with law enforcement; to maintain steady and legal employment; to attend all

scheduled visitations with her children; to maintain safe, stable, and appropriate housing; to participate in individual counseling; to undergo a psychiatric evaluation at MHMR; to submit to random drug testing; and to fully participate in and complete outpatient drug treatment at CATS. The evidence concerning Mother's compliance with these requisites is set forth below.

### 1. Contact with Caseworker and Involvement with Law Enforcement

The record does not indicate that Mother ever failed to maintain contact with her caseworker, nor does it show that Mother had any involvement with law enforcement while the termination case was pending.

### 2. Employment

Mother had been employed at Denny's for four or five years, minus the time she was on leave for her pregnancies with Gail and with Grant. Mother usually worked on Sundays from 2 p.m. to 10 p.m., on Mondays and Tuesdays from 6 a.m. to 6 p.m., and on Wednesdays and Thursdays from 6 p.m. to 6 a.m. Mother testified that her boss would modify Mother's work schedule to accommodate her children if the trial court returned them to her. Mother had been saving money to provide for Gail and Grant in the event the trial court allowed them to be returned to her care.

### 3. Visits

The initial service plan for each of the children notes that both Gail and Grant have "a significant relationship with" and appear to be "very bonded" with

Mother. Mother continued that bond by attending weekly visits with her children. Lewinson testified that Mother was loving and supportive at the visits with her children. Lewinson further testified that Mother's interactions with her children were positive during all of her visits.

### 4. Housing

While the case was pending, Mother lived at her sister's house, at her sister-in-law's house, and in her own efficiency apartment before moving to a two-bedroom apartment to accommodate her children. Mother testified that she had lived in her two-bedroom apartment for six or seven months prior to the termination trial.

### 5. Individual Counseling

Christopher Hooker, Mother's counselor with Merit Family Services, interviewed Mother in May 2017. Hooker testified that Mother indicated some past suicidal ideation, a considerable level of depression, some anxiety, and some anger behavior. At her July 24, 2017 appointment, Mother presented with noticeable fatigue, which Hooker attributed to possible illegal substance abuse but which Mother attributed to her work schedule.[8] Mother told Hooker that she had resumed taking her prescribed psychotropic medications. Hooker testified that it was concerning that Mother had not taken her medication consistently. At her September 22, 2017 appointment, Mother presented with indications of

_____

[8]Hooker did not recall the type of job Mother worked.

11

depression, anxiety, and symptoms of a thought disorder. On October 31, 2017, Hooker observed that Mother exhibited slurred speech and fatigue; she said that she had been in bed for the previous twelve hours. Hooker explained to Mother that spending the majority of her day off in bed was not a positive indication of her overall mood and mood management for the future. During the November 7, 2017 appointment, Mother presented in an agitated mood; she cried a lot, had a conversation with herself without any interaction from Hooker, and used rapid speech. On November 28, 2017, Mother reported to Hooker that she was no longer spending her days off in bed and that she was able to complete tasks. Hooker instructed Mother to continue to take her psychotropic medications as prescribed, but Mother said that she did not want to be dependent on her medication and that she wanted to manage her mood without medication. Hooker testified that this concerned him because given her history of mood-related issues, not continuing on her medication for a period of time "could potentially be clinically risky for her."

Mother did not return for future counseling sessions with Hooker following November 28, 2017, so Hooker did not discharge her for successfully completing individual counseling. On cross-examination, Hooker agreed that Mother may have been upset or shown signs of depression during her sessions because she did not have her children. Hooker testified that there was a lot of fluctuation during the course of Mother's treatment, which consisted of sixteen sessions

over a six-month period; he said that there were periods of improvement followed by periods of clinical regression.

When Lewinson talked to Mother on January 18, 2018, about individual counseling, Mother said that she had not contacted Merit to schedule her counseling appointments but that she was going to request a new counselor when she returned to counseling because Hooker was non-emotional and was not as supportive as her prior counselor had been. Lewinson testified that Mother returned to counseling at Merit after she spoke with her in January 2018.

### 6. MHMR

Although the record does not disclose whether Mother underwent a psychiatric evaluation at MHMR, Mother had obtained her own peer counselor through MHMR.

### 7. Random Drug Testing and Outpatient Drug Treatment

During the CPS case, Mother tested positive for cocaine on three urinalysis tests: February 24, 2017; March 2, 2017; and July 25, 2017. When asked during cross-examination whether Mother had tested negative on urinalysis tests from September 2017 through February 2018, Lewinson said that she did not have the results of those tests in front of her but that CPS had received "some negative UA tests" from Mother.[9]

---

[9]The last progress report that was completed by the conservatorship worker on November 7, 2017, mentioned that the September 15, 2017 and October 23, 2017 urinalysis tests were negative. Mother also tested negative on urinalysis tests on March 22, 2017; April 25, 2017; and May 16, 2017.

13

Mother's hair-follicle test results during the CPS case are as follows:

| January 27, 2017 | Cocaine >20,000 pc/mg |
| July 25, 2017 | Cocaine 11,219 pc/mg |
| October 24, 2017 | Cocaine 1,163 pc/mg |
| January 24, 2018 | Cocaine 7,829 pc/mg |
| February 18, 2018 | Cocaine 926 pc/mg[10] |

After Mother's January 24, 2018 hair-follicle drug test showed an increase in the level of cocaine, Mother requested to pay for her own hair-follicle drug test because she believed the test results were incorrect and because she wanted to prove that she was not using drugs. Mother then paid for a hair-follicle drug test that Lewinson agreed was the same type of hair-follicle drug test that CPS utilized. Mother gave Lewinson a copy of her February 18, 2018 hair-follicle drug test results, which reflected that the level of cocaine had decreased almost 7,000 picograms per milligram in less than three weeks.

Prior to the termination trial, Mother filed a "Motion For Extension Of Dismissal Date And Motion For Continuance Of Trial Setting" and a "Motion For Appointment Of Testifying Forensics Expert," requesting a toxicology expert to explain the decrease between Mother's January 2018 and February 2018 hair-follicle drug test results. The trial court heard argument on the motion for continuance prior to the start of the trial. After hearing argument from the

---

[10]Mother paid for this test herself because she did not believe that the January 24, 2018 hair-follicle test results were accurate.

attorneys, the trial court denied the motion for continuance and implicitly denied Mother's request for the appointment of a toxicology expert.

## 8. Summary of Mother's Compliance with Service Plan

Lewinson testified regarding Mother's compliance with her service plan. Mother had been successfully discharged from CATS drug-treatment therapy, had regularly attended her parent-child visits, had obtained a two-bedroom apartment, and had maintained employment as an assistant manager at Denny's. According to Lewinson, Mother had not been successfully discharged from individual counseling, had not successfully completed anger-management classes,[11] and had not remained drug free while the case was pending.

## G. The Children's Status in Foster Care

Gail's service plan describes her as a "happy and joyful child" who "enjoys being around others and loves to play" and who has no special needs or high risk behaviors. Grant's service plan describes him as a "happy and alert infant" who "enjoys being around others and watches them closely" and who "is playful and loves doing tummy time." Grant's service plan further states that he has been diagnosed with gastroesophageal reflux disease (GERD) but that it is managed

---

[11]The record does not reflect that the trial court ever ordered Mother to complete anger-management classes; Mother enrolled in them on her own. The record further reflects that Mother did not complete the course because she was required to admit to drug use for CPS to pay for the program or to pay $300 out of pocket for it; Mother told Lewinson that she would not admit to using drugs when she was clean. Mother testified that she had been successfully discharged from one anger-management program.

15

with the use of Alimentum formula. He has no other special needs and no high-risk behaviors.

Lewinson testified that Gail and Grant had been in two foster homes[12] and were "doing really well" and were flourishing in their environment. Lewinson testified that Gail and Grant were currently in an adoption-motivated foster home and that CPS would pursue having the children adopted if the trial court terminated Father's and Mother's parental rights to Gail and to Grant. Lewinson said that the foster parents were "great with the kids." Lewinson noted that Gail and Grant love their foster parents and seek help and comfort from them. Lewinson testified that the foster parents provide a safe and stable home for Gail and Grant. Lewinson said that the programs available to help the foster parents include financial assistance through a postadoption subsidy; counseling services; case management; college tuition; and Medicaid coverage, if the children qualify.

---

[12]The record reflects that the children were moved to a new foster placement on August 8, 2017. The children's service plans that were completed on May 9, 2017, state that they are very bonded with their foster parents and that they recognize the foster parents as their caregivers, but these service plans were completed prior to the children being moved to another foster home.

16

## H. The Department's Recommendations[13]

Lewinson testified that CPS's goal changed from reunification to termination and adoption in January 2018 based on the results of Mother's hair-follicle drug test, which showed an increase in the level of cocaine from the prior hair-follicle drug test and thus showed that Mother had not demonstrated "changed behavior."

Lewinson testified that Father cannot meet the physical and emotional needs of the children now and in the future because he has a history of drug use, he supports Mother's claims that she is not using drugs and believes that her positive drug tests are invalid, and he has a pattern of neglect and the inability to be protective of his children as demonstrated by the termination of his parental rights to his twins. Lewinson also testified that Father cannot protect the children from emotional and physical danger now and in the future based on his history of drug use, his pending criminal cases, his support of Mother's drug use, his pattern of neglect and inability to be protective of his children, and his failure to complete his service plan. Lewinson opined that it was in the children's best interest for the trial court to terminate Father's parental rights to Gail and to Grant because Father had stated at the outset that he did not want to be involved in

[13]The record does not contain a recommendation from the children's guardian ad litem. And though the record mentions a Court-Appointed Special Advocate, it appears that he was assigned and served only during the FBSS case because the record does not contain any reports or recommendations from him, nor did he appear for trial.

their lives, he was not compliant with his service plan, he had a history of drug use, and he had not presented CPS with any certificates saying that he had completed drug therapy.

Lewinson opined that Mother could not meet Gail's and Grant's emotional and physical needs now and in the future because Mother's drug use impaired her ability to supervise and to protect Gail and Grant, her cocaine relapse indicates that she placed her needs above her children's needs, she had not demonstrated changed behavior as reflected by her continued drug use, and she had not taken her psychotropic medication as prescribed. Lewinson further opined that it was in Gail's and Grant's best interest for the trial court to terminate Mother's parental rights because she had admitted to using cocaine after Gail was born in 2015; Mother had continued to deny drug use despite numerous positive tests, including testing positive while pregnant with Grant; she had admitted to taking hydrocodone that was not prescribed to her; she had unsupervised contact with the children in violation of the FBSS safety plan; she gave Gail to a stranger following a car accident; and she had not consistently taken her prescribed psychotropic medications.

## I. Mother's Case in Chief

### 1. Mother's Testimony

Mother testified that she knew she was in violation of the FBSS safety plan on the day of the car accident because she had Gail in her care without her sister supervising her. Mother testified that the police told her to leave Gail with her

friend—whom Mother described as an old friend that she had not had contact with in a few years—while Mother went to check on her brother. Mother's friend provided Mother with her cell phone number, but Mother misplaced the number. Because Mother's friend had no way to contact Mother, Mother "put out an Amber Alert" for Gail. Mother's friend then took Gail to the police station.

Mother said that she made a one-time mistake when she used drugs in December 2015. She testified that she is dedicated to staying off drugs. Mother said that she disagreed with the last hair-follicle drug test that she took for CPS and that she paid almost $400 from her savings to have another hair-follicle drug test performed. On cross-examination, Mother maintained that she had not used cocaine in over two years.

Mother testified that she had seen a difference in herself since her parental rights were terminated to her twins. She testified that she is "[w]ay more stable" than she was in 2014. She had maintained a job, she had obtained a car and a two-bedroom apartment to accommodate her children, she had taken classes for her children, and she had support from her large extended family to help her with her children. Mother explained that the behavior fluctuations that Hooker noted during her counseling sessions were due to missing Gail and Grant and to working long hours.

Mother testified that she had found someone to keep the children while she worked. Mother explained that when the children become school age, she does not want to send them to public school because she felt like "it's too much

19

going on." So Mother had made arrangements for the children to be homeschooled by one of their foster mothers. Mother testified that she and the foster mother had a great connection and had developed a relationship while Gail and Grant were in her home and that Gail loved the foster mother's children.

The trial court asked Mother if Father had done anything to support Gail and Grant, and she said that if she needed help with "anything, diapers, wipes, help with a bill, he did come through." Mother said that Father also regularly came to see Gail and Grant when they were born to check on them and on Mother.

## 2. Mother's Supporters

Marie Brown Vaquerfernandez, who had worked at Denny's with Mother for three years, testified that Mother had requested to work the day shift because it would be a better schedule for having her children back with her. Vaquerfernandez testified that Mother's ability to manage a restaurant is excellent and that she works long hours and goes "above and beyond."

Mother's younger sister testified that Mother had tried harder to work her service plan with this case than she did in her twins' case. Mother's younger sister further testified that she would feel comfortable leaving her children in Mother's care.

Stephanie Hill, Mother's long-time best friend, testified that she would be willing to help Mother. Hill said that she "[o]ne hundred percent" thinks Mother is appropriate to watch Hill's son and that her son would be safe in Mother's care.

20

## J. Outcome

After hearing the above testimony and reviewing the evidence admitted at trial, the trial court found by clear and convincing evidence that Father had violated subsections (M) and (O) of section 161.001(b)(1) and that termination of his parental rights was in Gail's and in Grant's best interest. The trial court also found by clear and convincing evidence that Mother had violated subsections (D), (E), (M), and (O) of section 161.001(b)(1) and that termination of her parental rights was in Gail's and in Grant's best interest. Following the termination trial, Mother filed a second amended motion for new trial, which the trial court heard and denied. Father and Mother each perfected an appeal from the trial court's termination order.

## III. BURDEN OF PROOF AND STANDARDS OF REVIEW

In a termination case, the State seeks not just to limit parental rights but to erase them permanently—to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except the child's right to inherit. Tex. Fam. Code Ann. § 161.206(b) (West Supp. 2017); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). Consequently, "[w]hen the State seeks to sever permanently the relationship between a parent and a child, it must first observe fundamentally fair procedures." *In re E.R.,* 385 S.W.3d 552, 554 (Tex. 2012) (citing *Santosky v. Kramer*, 455 U.S. 745, 747–48, 102 S. Ct. 1388, 1391–92 (1982)). We strictly scrutinize termination proceedings and strictly construe

involuntary termination statutes in favor of the parent. *In re E.N.C.*, 384 S.W.3d 796, 802 (Tex. 2012); *E.R.*, 385 S.W.3d at 554–55; *Holick*, 685 S.W.2d at 20–21.

Termination decisions must be supported by clear and convincing evidence. *See* Tex. Fam. Code Ann. §§ 161.001(b), 161.206(a); *E.N.C.*, 384 S.W.3d at 802. Due process demands this heightened standard because "[a] parental rights termination proceeding encumbers a value 'far more precious than any property right.'" *E.R.*, 385 S.W.3d at 555 (quoting *Santosky*, 455 U.S. at 758–59, 102 S. Ct. at 1397); *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002); *see also E.N.C.*, 384 S.W.3d at 802. Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007 (West 2014); *E.N.C.*, 384 S.W.3d at 802.

For a trial court to terminate a parent-child relationship, the Department must establish by clear and convincing evidence that the parent's actions satisfy one ground listed in family code section 161.001(b)(1) and that termination is in the best interest of the child. Tex. Fam. Code Ann. § 161.001(b); *E.N.C.*, 384 S.W.3d at 803; *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Both elements must be established; termination may not be based solely on the best interest of the child as determined by the trier of fact. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re C.D.E.*, 391 S.W.3d 287, 295 (Tex. App.— Fort Worth 2012, no pet.).

In evaluating the evidence for legal sufficiency in parental-termination cases, we determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that the Department proved the challenged ground for termination. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We review all the evidence in the light most favorable to the finding and judgment. *Id.* We resolve any disputed facts in favor of the finding if a reasonable factfinder could have done so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved. *Id.* We consider undisputed evidence even if it is contrary to the finding. *Id.* That is, we consider evidence favorable to termination if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *See id.* We cannot weigh witness credibility issues that depend on the appearance and demeanor of the witnesses because that is the factfinder's province. *Id.* at 573–74. And even when credibility issues appear in the appellate record, we defer to the factfinder's determinations as long as they are not unreasonable. *Id.* at 573.

We are required to perform "an exacting review of the entire record" in determining whether the evidence is factually sufficient to support the termination of a parent-child relationship. *In re A.B.,* 437 S.W.3d 498, 500 (Tex. 2014). In reviewing the evidence for factual sufficiency, we give due deference to the factfinder's findings and do not supplant the judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We determine whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that the

parent violated one of the provisions of section 161.001(b)(1) and that termination of the parent-child relationship would be in the best interest of the child. *See* Tex. Fam. Code Ann. § 161.001(b)(1), (2); *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient. *H.R.M.*, 209 S.W.3d at 108.

## IV. SECTION 161.001(B)(1) GROUND

### A. Father's Challenge to (b)(1) Grounds

In his first issue, Father argues that the evidence is legally and factually insufficient to support the trial court's judgment under section 161.001(b)(1)(D) and (E). The trial court, however, did not terminate Father's parental rights to Gail and to Grant under subsections (D) and (E) but instead terminated Father's parental rights under subsections (M)[14] and (O). Father's counsel concedes in his brief that the Department "proved element (M) of the petition in that the prior

---

[14]Section 161.001(b)(1)(M) states that the trial court may order termination of the parent-child relationship if the court finds by clear and convincing evidence that the parent has "had his or her parent-child relationship terminated with respect to another child based on a finding that the parent's conduct was in violation of Paragraph (D) or (E) or substantially equivalent provisions of the law of another state[.]" Tex. Fam. Code Ann. § 161.001(b)(1)(M). The subsection (D) and (E) grounds mentioned in subsection (M) thus relate to the parent's conduct toward another child in a prior termination suit—not to the parent's conduct in the present case. *See id.*

24

termination was proved by clear and convincing evidence." Because the record contains sufficient evidence to support Father's concession regarding the trial court's subsection (M) finding—the prior termination order that was admitted at trial showing that Father's parental rights to another child were previously terminated based on a finding under subsection (D) or (E)—and because only one ground under section (b)(1) is necessary to support termination, we overrule Father's first issue. *See In re N.J.D.*, No. 14-17-00711-CV, 2018 WL 650450, at *5 (Tex. App.—Houston [14th Dist.] Feb. 1, 2018, pet. denied) (mem. op.) (stating that unchallenged fact finding is binding unless it is unsupported by evidence and holding evidence sufficient to support termination finding under subsection (O), which mother conceded on appeal); *In re K.C.*, 23 S.W.3d 604, 607 (Tex. App.—Beaumont 2000, no pet.) ("Were we to hold the record contains insufficient evidence to support the trial court's finding that [father] engaged in conduct which endangered [the child], the decree of termination would be supported by the unchallenged findings.").[15]

---

[15]Because, along with a best-interest finding, a finding of only one ground alleged under section 161.001(b)(1) is necessary to support a judgment of termination, we need not address Father's second issue challenging the evidence the trial court judicially noticed to support its finding under subsection (O) of section 161.001(b)(1). *See* Tex. R. App. P. 47.1; *see also In re E.M.N.*, 221 S.W.3d 815, 821 (Tex. App.—Fort Worth 2007, no pet.); *In re S.B.*, 207 S.W.3d 877, 886 (Tex. App.—Fort Worth 2006, no pet.).

## B. Mother's Challenge to (b)(1) Grounds

In her first, second, and third issues, Mother argues that the evidence is factually insufficient to support the trial court's subsection (D), (E), and (O) findings. Mother, however, specifically states in her brief that "[t]he finding of the trial court in regard to § 161.001(b)(1)(M), prior termination of parental rights pursuant to § 161.001(b)(1)(D) and (E), is not disputed." Because the record contains sufficient evidence to support the trial court's unchallenged subsection (M) finding—the prior termination order that was admitted at trial showing that Mother's parental rights to another child were previously terminated based on a finding under subsection (D) or (E)—and because only one ground under section (b)(1) is necessary to support termination, we overrule Mother's first, second, and third issues.[16] *See N.J.D.*, 2018 WL 650450, at *5 ; *K.C.*, 23 S.W.3d at 607.

---

[16]In her fourth issue, Mother argues that the trial court erred by denying her motion requesting that a toxicology expert be appointed to examine the results of the drug tests Mother took because it prevented her "from fully defending [t]he Department's request to terminate her parental rights pursuant to [section] 161.001(b)(1)(D) and (E)"; in her fifth issue, Mother argues that the trial court erred by denying her motion for new trial on the grounds alleged in her fourth issue. In her eighth issue, Mother argues that the trial court erred by taking judicial notice of several orders that adopted service plans. Because these issues attack the trial court's subsection (D), (E), and (O) findings, and because we hold that the trial court's termination order can be upheld solely based on the subsection (M) finding, we need not address Mother's fourth, fifth, and eighth issues. *See* Tex. R. App. P. 47.1; *see also E.M.N.*, 221 S.W.3d at 821; *S.B.*, 207 S.W.3d at 886.

In her sixth and seventh issues,[17] Mother argues that the trial court abused its discretion by admitting testimony regarding facts that formed the basis of a previous order terminating her parental rights to her twins, that the evidence was irrelevant to the instant case, that it was unfairly prejudicial, and that the trial court erred by denying her motion for new trial alleging these same arguments. Mother contends that testimony regarding her prior drug use and being discharged from an inpatient-treatment program at a Volunteers of America facility was irrelevant to prove any fact of the current case and was more prejudicial than probative. Mother admitted in her second amended motion for new trial that "[n]o objection to such inquiries was made" by her trial counsel. Because Mother did not object to the complained-of evidence, her complaints are not preserved for our review. *See* Tex. R. App. P. 33.1(a); *Bushell v. Dean*, 803 S.W.2d 711, 712 (Tex. 1991) (op. on reh'g).

Even if Mother's trial counsel had objected to the complained-of testimony during the trial, any relevancy or more-prejudicial-than-probative objections most likely would not have kept out the complained-of testimony. In addition to supporting the subsection (M) ground, the testimony about Mother's prior drug abuse and her unsuccessful discharge from the Volunteers of America inpatient program was relevant both to the endangering conduct finding under subsection

---

[17]To the extent that Mother's sixth and seventh issues conflict with her concession by challenging the evidence supporting the subsection (M) finding, we address them. *See* Tex. R. App. P. 38.9 (requiring briefs to be construed liberally).

(E) and to the best-interest analysis. *See* Tex. R. Evid. 401; Tex. Fam. Code Ann. § 263.307(b)(8), (11) (West Supp. 2017) (setting forth factors court can consider in determining whether child's parents are willing and able to provide the child with a safe environment, including whether there is a history of substance abuse by the child's family and the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time); *Jordan v. Dossey*, 325 S.W.3d 700, 724 (Tex. App.—Houston [1st Dist.] 2010, pet. denied) (stating that evidence as to how a parent has treated another child is relevant regarding whether a course of endangering conduct has been established). Moreover, Mother's blanket statement—that "[s]uch testimony only served to prejudice the court against [her]"—does not meet her burden of showing how the complained-of testimony was unfairly prejudicial. *See* Tex. R. Evid. 403; *In re M.G.N.*, 491 S.W.3d 386, 403 (Tex. App.—San Antonio 2016, pet. denied) (stating that the opponent of the proffered evidence has the burden to show why the evidence is prejudicial and how the prejudicial attributes "substantially outweigh the probative value of the evidence"); *Murray v. Tex. Dep't of Family & Protective Servs.*, 294 S.W.3d 360, 369 (Tex. App.—Austin 2009, no pet.) (stating that mother did not explain on appeal how the evidence was unfairly prejudicial). Accordingly, we hold that the trial court did not abuse its discretion by admitting the complained-of testimony or by overruling Mother's motion for new trial based on such testimony, and we overrule Mother's sixth and seventh issues.

## V. SECTION 161.001(B)(2) GROUND

In Father's third issue, he argues that the evidence is factually insufficient to support the trial court's best-interest finding. In Mother's ninth issue, she argues that the evidence is legally and factually insufficient to support the trial court's best-interest finding.[18] We analyze the best-interest finding as to each parent below.

### A. Best-Interest Factors

There is a strong presumption that keeping a child with a parent is in the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006).

We review the entire record to determine the child's best interest. *In re E.C.R.*, 402 S.W.3d 239, 250 (Tex. 2013). The same evidence may be probative of both the subsection (1) ground and best interest. *Id.* at 249; *C.H.*, 89 S.W.3d at 28. Nonexclusive factors that the trier of fact in a termination case may also use in determining the best interest of the child include the following: (A) the desires of the child; (B) the emotional and physical needs of the child now and in the future; (C) the emotional and physical danger to the child now and in the future; (D) the parental abilities of the individuals seeking custody; (E) the

---

[18]Although Mother's ninth issue references only a factual sufficiency challenge to the evidence supporting the trial court's best-interest finding, the argument and analysis sections of her brief include a legal sufficiency challenge. We therefore broadly construe Mother's ninth issue as challenging both the legal and factual sufficiency of the evidence to support the trial court's best-interest finding. *See* Tex. R. App. P. 38.1(f) ("The statement of an issue or point will be treated as covering every subsidiary question that is fairly included."); *see also* Tex. R. App. P. 38.9 (requiring briefing rules to be construed liberally).

programs available to assist these individuals to promote the best interest of the child; (F) the plans for the child by these individuals or by the agency seeking custody; (G) the stability of the home or proposed placement; (H) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and (I) any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *see E.C.R.*, 402 S.W.3d at 249 (stating that in reviewing a best-interest finding, "we consider, among other evidence, the *Holley* factors"); *E.N.C.*, 384 S.W.3d at 807. These factors are not exhaustive, and some listed factors may be inapplicable to some cases. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the best interest of the child. *Id.* On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.*

## B. Father's Best-Interest Challenge

With regard to the children's desires, neither child testified at trial; they were both under four years old, and there is no evidence in the record about the children's desires regarding placement. The record reflects that the children love their foster parents and seek help and comfort from them. Although there is evidence that Father had positive interactions with the children during the visits he attended, his involvement in their lives was minimal prior to the CPS case, and he waited nine months after the children were removed to begin visiting regularly with the children. *See In re J.D.,* 436 S.W.3d 105, 118 (Tex. App.—

30

Houston [14th Dist.] 2014, no pet.) (stating that when a child is too young to express his or her desires, the factfinder may consider whether the child has bonded with his or her current caregiver, is well-cared for, and whether the child has spent minimal time with the parent). The trial court was entitled to find that this factor weighed in favor of terminating Father's parental rights to Gail and to Grant.

With regard to the children's emotional and physical needs now and in the future, Gail does not have any special needs, but Grant has been diagnosed with GERD. The children's basic needs include food, shelter, and clothing; routine medical and dental care; a safe, stimulating, and nurturing home environment; and friendships and recreational activities appropriate to their ages. The record reflects that Father provided for some of the children's physical needs when Mother sought assistance from him, but he did not live with or act as a caretaker for the children and did not provide details regarding whether his home was suitable for the children. The trial court was entitled to find that this factor weighed in favor of terminating Father's parental rights to Gail and to Grant.

With regard to the emotional and physical danger to the children now and in the future, the evidence demonstrates that Father had been arrested while the CPS case was pending and that he had not completed the recommendations from his drug assessment and would not provide his sober date. The trial court was entitled to find that this factor weighed in favor of terminating Father's parental rights to Gail and to Grant.

With regard to Father's parental abilities, the record demonstrates that Father had completed parenting classes but that he had not completed the FOCUS for Fathers class. Father had never lived with the children or been their caretaker; his interactions with the children were limited to checking on them after they were born and to seeing them at the one-hour weekly visits that he attended after the children were removed from Mother. Moreover, a factfinder could reasonably form a firm conviction or belief that Father was still using drugs because he had not provided his caseworker with a sober date, had tested positive on two urinalysis drug tests, and had failed to take two requested drug tests. The trial court was entitled to find that this factor weighed in favor of terminating Father's parental rights to Gail and to Grant.

With regard to the programs available to assist Father and the foster parents to promote the best interest of the children, the record reveals that Father had not completed the services that CPS had offered him. The foster parents could obtain financial assistance through a postadoption subsidy; counseling services; case management; college tuition; and Medicaid coverage, if the children qualify. The trial court was entitled to find that this factor weighed in favor of terminating Father's parental rights to Gail and to Grant.

With regard to the plans for the children by the individuals seeking custody and the stability of the home or proposed placement, Father wanted his children to grow up to be happy and healthy, but he expressed to Lewinson that he was focused on maintaining his freedom by staying out of jail and never provided

32

details when asked about the apartment where he lived. Although the children had been in two foster homes during the case, the children had been in their second foster home for almost seven months at the time of the trial, and the Department planned for the children to be adopted by their foster parents. The trial court was entitled to find that this factor weighed in favor of terminating Father's parental rights to Gail and to Grant.

With regard to the acts or omissions of Father that may indicate the existing parent-child relationship is not a proper one, the analysis set forth above—which details Father's criminal history, his failure to address his drug abuse, and the termination of his parental rights to his twins—reveals that the existing parent-child relationship between Father and the children is not a proper parent-child relationship. The trial court was entitled to find that this factor weighed in favor of terminating Father's parental rights to Gail and to Grant.

As for any excuse for the acts or omissions of the parent, Father's excuse for not finishing his drug classes was that he had gone to jail and had not resumed his drug classes upon his release because he did not have transportation and would not ride the bus. Father contends in his brief that he was not at fault for the children's removal, which was based on Mother's shortcomings. The trial court was entitled to find that this factor weighed in favor of terminating Father's parental rights to Gail and to Grant.

Reviewing all the evidence with appropriate deference to the factfinder, we hold that the trial court could have reasonably formed a firm conviction or belief

33

that termination of the parent-child relationship between Father and Gail and Grant was in the children's best interest, and we therefore hold the evidence factually sufficient to support the trial court's best-interest finding. *See* Tex. Fam. Code Ann. § 161.001(b)(2); *Jordan*, 325 S.W.3d at 733 (holding evidence factually sufficient to support the trial court's best-interest finding when most of the best-interest factors weighed in favor of termination); *In re T.R.M.*, No. 14-14-00773-CV, 2015 WL 1062171, at *11–12 (Tex. App.—Houston [14th Dist.] Mar. 10, 2015, no pet.) (mem. op.) (holding evidence factually sufficient to support best-interest finding based on mother's lack of a safe, stable home environment; noncompliance with services; and drug use). We overrule Father's third issue.

### C. Mother's Best-Interest Challenge

With regard to the children's desires, as mentioned above, both children were too young to testify at trial, so there is no evidence in the record about the children's desires regarding placement. The record contains evidence that the children were very bonded with Mother when they came into foster care and that Mother's interactions with the children were all positive during their weekly visits. The record also reflects that the children love their foster parents and seek help and comfort from them. This factor weighs neither for nor against terminating Mother's parental rights to Gail and to Grant.

With regard to the children's physical needs now and in the future, Mother—who was employed full time and had a two-bedroom apartment—was able to provide for the children's physical needs regarding food, clothing, and

34

housing. Concerning Mother's ability to provide for Gail and Grant's emotional needs, the evidence demonstrates Mother's continued struggle with cocaine use.[19] Although Mother testified that she had not used cocaine for over two years prior to the termination trial that started on February 27, 2018, she had tested positive for cocaine in both February 2016 and March 2016 when she was pregnant with Grant (Grant was born in July 2016); had tested positive for cocaine on all five of her hair-follicle drug tests that were performed in 2017 and 2018; and had also submitted three urine specimens that were positive for cocaine on February 24, 2017; on March 2, 2017; and on July 25, 2017. The trial court was entitled to find that this factor weighed in favor of terminating Mother's parental rights to Gail and to Grant.

With regard to the emotional and physical danger to the children now and in the future, the Department expressed concern over Mother's failure to take her prescribed psychotropic medications, her drug use while she was the children's sole caretaker, and her failure to successfully complete individual counseling. Although Mother had begun taking her prescribed psychotropic medications, she told her counselor that she wanted to manage her mood without medication,

---

[19]Mother asserts that the results of the January 24, 2018 hair-follicle drug test of 7,829 pc/mg and the February 18, 2018 hair-follicle drug test of 926 pc/mg are incompatible. We agree. But the tests were not performed by the same lab, and Mother's February 18, 2018 hair-follicle drug test was not confirmed by a second lab, as were the hair-follicle drug tests paid for by CPS. Moreover, even Mother's February 18, 2018 hair-follicle drug test shows that she tested positive for cocaine.

which concerned her counselor because discontinuing her medication for a period of time "could potentially be clinically risky for her." And although Mother had completed drug treatment, she tested positive for cocaine on five hair-follicle drug tests and three urinalysis drug tests while the case was pending. The trial court was entitled to find that this factor weighed in favor of terminating Mother's parental rights to Gail and to Grant.

With regard to Mother's parental abilities, the record demonstrates that Mother's interactions with her children at the weekly visits were always positive and that she had completed parenting classes while the case was pending. The record demonstrates that Mother had used drugs while she was pregnant with Grant, which endangered him in utero and which also endangered Gail, for whom she was the sole caretaker. Mother had also continued to test positive for cocaine during the CPS case. Moreover, during the FBSS case, Mother left Gail with a woman she barely knew. The trial court was entitled to find that this factor weighed in favor of terminating Mother's parental rights to Gail and to Grant.

With regard to the programs available to assist Mother and the foster parents to promote the best interest of the children, the record reveals that Mother knowingly violated the FBSS safety plan by having unsupervised contact with Gail and then trying to conceal her violation by leaving Gail with an unnamed woman whom Mother knew from the club scene. Mother had not completed all of her CPS services; she was not successfully discharged from individual counseling and had not remained drug free while the case was pending. The

36

foster parents could obtain financial assistance through a postadoption subsidy; counseling services; case management; college tuition; and Medicaid coverage, if the children qualify. The trial court was entitled to find that this factor weighed in favor of terminating Mother's parental rights to Gail and to Grant.

With regard to the plans for the children by the individuals seeking custody and the stability of the home or proposed placement, Mother had made plans for the children's return by renting a two-bedroom apartment approximately seven months prior to trial, purchasing a car, starting a savings account, securing child care for when she was at work, and arranging for the children to be homeschooled when they become school age. The children had been in two foster homes while in the Department's care—with their second placement occurring approximately seven months prior to trial, and the Department planned for the children to be adopted by their current foster parents. This factor weighs neither for nor against terminating Mother's parental rights to Gail and to Grant.

With regard to the acts or omissions of Mother that may indicate the existing parent-child relationship is not a proper one, the analysis set forth above—which reflects that Mother left Gail with an unnamed woman, that Mother did not successfully complete individual counseling, and that she used drugs while pregnant with Grant and continued to test positive for cocaine throughout the pendency of the case—reflects that the existing parent-child relationship between Mother and the children is not a proper parent-child relationship. The

trial court was entitled to find that this factor weighed in favor of terminating Mother's parental rights to Gail and to Grant.

As for any excuse for the acts or omissions of the parent, Mother admitted that she had "slipped up" or had "messed up" when she used cocaine in December 2015. Mother also admitted that she had "messed up" by leaving Gail with a friend after the accident and explained why Gail was in the car with her instead of in the car with her sister and Grant. This factor weighs neither for nor against terminating Mother's parental rights to Gail and to Grant.

After reviewing the entire record, it reflects that Mother has made numerous positive changes in her life. In conducting a legal and factual sufficiency review of the evidence to support the trial court's best-interest finding, however, our focus is on whether clear and convincing evidence exists supporting termination based on the (b)(2) best-interest ground, not only on the positive progress made by Mother to better herself and her situation. Our review of the evidence must also give due deference to the factfinder's credibility determinations; we are not allowed to supplant them with our own to reach the opposite result. *H.R.M.*, 209 S.W.3d at 108. Here, constrained by the standard of review and the required deference to the factfinder's credibility determinations, and after reviewing all the evidence and applying these standards, we hold that the trial court could have reasonably formed a firm conviction or belief that termination of the parent-child relationship between Mother and Gail and Grant was in the children's best interest. We therefore hold that the evidence is legally

38

and factually sufficient to support the trial court's best-interest finding. *See* Tex. Fam. Code Ann. § 161.001(b)(2); *Jordan*, 325 S.W.3d at 733 (holding evidence legally and factually sufficient to support the trial court's best-interest finding when most of the best-interest factors weighed in favor of termination); *S.B.*, 207 S.W.3d at 887–88 ("A parent's drug use . . . and failure to comply with [a] family service plan support a finding that termination is in the best interest of the child."). Accordingly, we overrule Mother's ninth issue.

## VI. CONCLUSION

Having overruled Father's first and third issues, which are dispositive of his appeal, we affirm the trial court's judgment terminating his parental rights to Gail and to Grant. Having overruled Mother's first, second, third, sixth, seventh, and ninth issues, which are dispositive of her appeal, we affirm the trial court's judgment terminating her parental rights to Gail and to Grant.

/s/ Sue Walker
SUE WALKER
JUSTICE

PANEL: WALKER, KERR, and PITTMAN, JJ.

DELIVERED: August 16, 2018